**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RELX, INC. d/b/a LEXISNEXIS, | |
| Plaintiff, | Case No. _____ |
| v. | **JURY TRIAL DEMANDED** |
| AARON ISAACSON and LEGAL BILL REVIEW GROUP LLC d/b/a LEGALBILLREVIEW.COM, | |
| Defendants. | |

**VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff RELX Inc. d/b/a LexisNexis ("LexisNexis") states as follows for its verified complaint against Defendants Aaron Isaacson ("Isaacson") and Legal Bill Review Group LLC d/b/a LegalBillReview.com ("LBR") (collectively, the "Defendants"):

**NATURE OF THE CASE**

1.      This is an action for misappropriation of trade secrets, breach of loyalty, breach of contract, and tortious interference, all for which LexisNexis seeks a temporary restraining order, preliminary and permanent injunctive relief, damages, and attorneys' fees.

2.      LexisNexis is a leading provider of products and services to the legal industry and one of LexisNexis' many divisions is responsible for selling products and services used by corporate legal departments. The products and services that LexisNexis sells to corporate legal departments include subscription-based software products that LexisNexis has developed, in-house professional services, as well as professional services that LexisNexis subcontracts out to partner companies.

1

3.     CounselLink is the flagship software platform subscription service that LexisNexis offers to its corporate customers. CounselLink is a platform that centralizes data related to a corporate legal department's legal matters, various contracts, invoices it receives, workflows, and legal hold notifications, all to assist the corporate legal department in controlling costs and maximizing productivity.

4.     CounselLink is not the only software product that LexisNexis sells, and among the many other professional services that LexisNexis offers for sale to customers is a service called "managed bill review." Managed bill review is the process of having trained experts review legal bills for compliance with guidelines and suitability. Managed bill review experts can rule on the appropriateness of time billed for the type of work performed (e.g., "this document should have taken four hours to prepare") and identify billing guideline violations on behalf of the corporate legal departments to increase efficiency and lower costs. Managed bill review experts can perform their work within the CounselLink software sold to corporate legal departments.

5.     From March 4, 20219 to September 15, 2023, Aaron Isaacson was employed by LexisNexis and worked as an Account Manager responsible for selling products and services to corporate legal departments. In his role, Isaacson was responsible for selling LexisNexis' products and professional service offerings, including both CounselLink, and all of CounselLink's accompanying professional services, such as managed bill review.

6.     On September 5, 2023, Isaacson announced his intention to resign his employment with LexisNexis. Isaacson's last day of employment with LexisNexis was September 15, 2023. At the time he resigned, Isaacson did not inform LexisNexis that he was leaving to accept employment with LBR.

7.     Like LexisNexis, LBR sells managed bill review services to corporate legal departments. LBR is aware that LexisNexis sells managed bill review services to corporate legal departments because LBR has itself repeatedly attempted to become a partner company to whom LexisNexis would consider subcontracting management bill review work for its customers.

8.     When he announced his resignation, Isaacson also failed to tell LexisNexis that he had, as of that date, already had access to LBR's customer relationship management ("CRM") database and had begun working for LBR since at least August 23, 2023.

9.     During the time period when Isaacson was working for both LBR and LexisNexis, Isaacson used his LexisNexis-issued laptop to misappropriate LexisNexis' trade secrets and confidential information for his own benefit and that of LBR's.

10.     Indeed, while working for LBR and before resigning from LexisNexis, Isaacson used his LexisNexis-issued laptop to set up his access to LBR's CRM database. Isaacson used his LBR company email to access that CRM database. Isaacson also exported to himself multiple copies of a LexisNexis customer list report titled "Execs, Corp Champions and Influencer Contacts," which contain highly confidential and proprietary information about LexisNexis' customers, including information about their satisfaction level with CounselLink and its services and support, about their purchasing levels, their LexisNexis Account Manager, the identities of their purchasing decisionmakers, and the contact information for those decisionmakers.

11.     Isaacson and LBR have now admitted that information about LexisNexis' customers contained in LexisNexis' confidential and proprietary customer lists was uploaded into LBR's CRM database as a result of Isaacson's activities in the final days of his LexisNexis employment (which were also the initial days of his LBR employment).

12.     After misappropriating LexisNexis' trade secret and confidential information, Isaacson and LBR then jointly embarked on a targeted campaign to solicit specific decisionmakers at LexisNexis' customers to attempt to persuade those customers to do business with LBR. These solicitations were unwelcome and unauthorized, and Defendants' actions have damaged, and are continuing to harm, LexisNexis' goodwill and customer relationships that LexisNexis has spent years and millions of dollars cultivating and developing.

13.     A temporary restraining order and preliminary injunction is required to put an end to the immediate and irreparable harm that Defendants are causing to LexisNexis' customer relationships through Defendants' misuse of LexisNexis trade secret and confidential information for their own benefit. Even at this preliminary stage of this dispute, LexisNexis has uncovered evidence showing that Defendants have unlawfully misappropriated LexisNexis' trade secrets and confidential information and have been deceitful in describing the scope of their wrongdoing.

14.     Without the protection of a Court order mandating a full forensic review of Defendants' computer systems and electronic devices, the remediation of LexisNexis' confidential and proprietary information therefore, and an order restricting Defendants from any use of such information to target and solicit LexisNexis' customers, LexisNexis will continue to be irreparably harmed in ways that traditional legal remedies cannot address.

## PARTIES

15.     RELX Inc., d/b/a LexisNexis is a Massachusetts corporation with its principal place of business in New York.

16.     Isaacson is a citizen of Illinois and is domiciled in Illinois.

17.     Isaacson obtained a law license in Illinois in 2008, but was disbarred in 2013 for, among other things, obstructing justice by lying to police during a police investigation.

18.     Upon information and belief, LBR is a Delaware limited liability company with its principal place of business in Pennsylvania.

## JURISDICTION AND VENUE

19.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over LexisNexis' claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq*., and the Lanham Act, 15 U.S.C. §§ 1125, *et seq*.

20.     This Court has supplemental jurisdiction over LexisNexis' state law claims pursuant to 28 U.S.C. § 1367, because all LexisNexis' claims are based on a common nucleus of operative fact and all claims form part of the same case or controversy.

21.     This Court has personal jurisdiction over Isaacson because he resides in Illinois, primary worked for LexisNexis at the inception and throughout his employment from Illinois, is currently domiciled in Illinois, and consented to personal jurisdiction in Illinois courts in the employment agreement that forms the basis of this lawsuit. Moreover, a substantial portion of the events that form the basis for this dispute, including Isaacson's misappropriation of LexisNexis' trade secrets and confidential information, occurred while Isaacson was working for LexisNexis (and LBR) in Illinois.

22.     This Court has personal jurisdiction over LBR because a substantial portion of the events that form the basis for this dispute occurred in Illinois. Among other things, LBR, with knowledge that Isaacson was working for both LexisNexis and LBR from Illinois, accepted LexisNexis' trade secret and confidential information and granted Isaacson access to its customer relationship management software for the purpose of allowing him to load LexisNexis' trade secret and confidential information into its customer database. Additionally, LBR has allowed Isaacson

to send targeted solicitations to customers of LexisNexis from Illinois that seek to sell LBR's products and services.

23. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial portion of the events that form the basis of this dispute occurred in this judicial district. Isaacson also consented to venue in this judicial district in the employment agreement that forms the basis of this lawsuit.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

I. **Isaacson Executes a Valid, Enforceable Agreement Containing Restrictive Covenants and Receives Access to LexisNexis' Trade Secrets and Confidential Information**

24. On February 21, 2019, at or near his first day of employment with LexisNexis, Isaacson signed a Non-Disclosure, Non-Solicitation and Non-Competition Agreement (the "Agreement"). A copy of the Agreement is attached to this Complaint as Exhibit 1.

25. Isaacson received valuable consideration for entering into the Agreement, which included (i) employment with LexisNexis and (ii) access to LexisNexis' customers and "Confidential Information" regarding such customers.

26. "Confidential Information" is expressly defined in the Agreement, and the definition of "Confidential Information" includes information about LexisNexis' "business plans," "operations," "customers," "customer retention strategies," "contractual preferences," "strategies and plans for servicing customers," "commercial, business, technical or marketing information," and other "nonpublic information that provides a competitive advantage" to LexisNexis.

27. The Agreement contains a Non-Disclosure Provision, which states:

> I [Isaacson] will hold all Confidential Information in the strictest confidence. During my employment, I will not use, disclose, reveal, publish or make available to any person or any business, firm, company or other entity any Confidential Information except as

reasonably required when acting within the scope of my duties. After my employment ends for any reason, I will not use, disclose, reveal, publish, or make available to any person or any business, firm, company or other entity any Confidential Information.

28.     The Agreement contains a Non-Solicitation Provision, which was in effect during Isaacson's LexisNexis employment and remains effective for 12-months immediately following Isaacson's employment. The Non-Solicitation provision states, in part:

I [Isaacson] shall not directly or indirectly, either on my own behalf or on behalf of or in conjunction with another person, or any business, firm, or other entity, engage in, assist others in or take any action to:

…

(ii) induce, solicit, market, service, contract, or sell to (or attempt to induce, solicit, market, service, contact, or sell to) any actual or prospective customer of any of the LexisNexis Legal & Professional Companies with whom I had Material Contact (defined below) at any time during the Pre-Termination Period for the purpose of competing with any of the LexisNexis Legal & Professional Companies in any Restricted Business (defined below); or

(iii) interfere with the relationship between, on the one hand, any of the LexisNexis Legal & Professional Companies, and, on the other hand, any actual or prospective customer, supplier, distributor, licensee, licensor, or other business relation of any of the LexisNexis Legal & Professional Companies with whom I had Material Contact at any time during the Pre-Termination Period (including, without limitation, inducing or soliciting or attempting to induce or solicit such business relation to reduce or cease doing business with any of the LexisNexis Legal & Professional Companies).

29.     The Agreement defines "Material Contact" as:

(i) interacting with an actual or prospective business relation in any effort to further a business relationship with any of the LexisNexis Legal & Professional Companies; (ii) coordinating or supervising the relationship of any of the LexisNexis Legal & Professional Companies with any business relation; (iii) directly or indirectly supervising or managing employees who interacted with any business relation in an effort to further a business relationship with any of the LexisNexis Legal & Professional Companies;

7

(iv) obtaining Confidential Information about any actual or prospective business relation in the course of my employment with any of the LexisNexis Legal & Professional Companies; or (v) receiving compensation, commissions, or earnings from any of the LexisNexis Legal & Professional Companies' sale of products or provision of services to any business relation.

30.     The Agreement defines the "Pre-Termination Period" as the 12-month period preceding the end of Isaacson's employment with LexisNexis.

31.     The Agreement defines "Restricted Business" as:

[A]ny business that (i) any of the LexisNexis Legal & Professional Companies was, as of the Employment End Date, actively engaged in or, during the Pre-Termination Period, actively considering, researching, or developing, and (ii) I [Isaacson] was actively involved in or about which I obtained or knew Confidential Information during the Pre-Termination Period.

32.     The Agreement contains a Non-Competition Provision, which states:

(a) During my employment with any LexisNexis Legal & Professional Companies, I will not, directly or indirectly, on my own behalf or on behalf of or in conjunction with any person, business, firm, company, or other entity, set up, join, become employed by, be engaged in, or provide any advice or services to, any enterprise (including, without limitation, any corporation, partnership, proprietorship, or other venture) which competes with any of the LexisNexis Legal & Professional Companies.

(b) During the 12-month period following the Employment End Date (whether such termination is voluntary or involuntary), I will not, directly or indirectly, on my own behalf or on behalf of or in conjunction with any person, or any business, firm, company, or other entity, hold any position or engage in activities as an employee, owner, agent, contractor, or otherwise for or with any enterprise (including, without limitation, any corporation, partnership, proprietorship, or other venture) which competes with any of the LexisNexis Legal & Professional Companies in any Restricted Business.

33.     The Agreement contains a provision titled "Return of Company Property and Information," which states:

> When my employment ends or at such other reasonable time that the LexisNexis Legal & Professional Company that then employs me requests, I agree that (a) I will promptly return, or upon written instruction destroy, all documents, data, drawings, manuals, letters, notes, reports, electronic mail, recordings, and copies thereof, of or pertaining to any of the LexisNexis Legal & Professional Companies or Confidential Information in my possession or control, and (b) I will promptly return any equipment provided to me, such as laptop computers, mobile phone devices or printers. Without limiting the foregoing, I specifically agree to provide any of the LexisNexis Legal & Professional Companies with access to any of my personal electronic devices as needed to remove any and all Confidential Information or other property of any of the LexisNexis Legal & Professional Companies contained on those devices.

34.     The above-referenced provisions of the Agreement are narrowly tailored to protect LexisNexis' legitimate business interests. LexisNexis developed, through great expense, significant customer goodwill and entrusted its employees, including Isaacson, with maintaining and nurturing customer relationships on LexisNexis' behalf.

35.     LexisNexis also devotes substantial resources to the recruitment, training, mentoring, and compensation of its employees so that they can perform the necessary services for customers, as well as develop and nurture the close relationships necessary to keep customers satisfied.

36.     In addition, LexisNexis has a legitimate interest in prohibiting its employees from taking, disclosing, and using its trade secret and confidential information, including its customer information. Because the market for the products and services sold to customers by LexisNexis is competitive, information pertaining to LexisNexis' products, services, strategies, and customers is confidential and proprietary information, deserving trade secret protection.

37.     LexisNexis developed and marketed an extremely successful sales operation that is highly dependent upon maintaining the secrecy of this information. The disclosure of these trade secrets would put LexisNexis at a competitive disadvantage, as this information is only valuable to the extent LexisNexis is able to maintain its secrecy.

## II.    LexisNexis' Business and Investments to Create Customer Goodwill and Protectable Business Interests

38.     LexisNexis is a company that sells a host of products and services to customers operating across the legal industry. LexisNexis' goal is to transform the way its customers work though the delivery of software and other services designed to increase efficiency and maximize productivity.

39.     LexisNexis' customers include government agencies, law firms and corporations, among other legal industry participants.

40.     As part of its efforts and company strategy to develop and offer products and software that are attractive to corporate legal departments, LexisNexis has created a Professional Services Team. The Professional Services Team delivers, among other services, onboarding and implementation, system integration, system configuration, strategic consulting, and training services to LexisNexis' CounselLink customers.

41.     LexisNexis' account executives are responsible for new business development and originating new customers for LexisNexis. Once an account executive originates a customer, that customer is then assigned to an account manager, who is responsible for servicing the customer's ongoing needs, selling ancillary and supplemental services, and otherwise maintaining the customer relationship. Account managers have no responsibility for originating net new business on LexisNexis' behalf, but account managers are responsible for generating additional annual recurring and services revenue.

42. At all times during this employment, Isaacson was employed as an account manager. Thus, Isaacson had no responsibilities whatsoever to originate new business on LexisNexis' behalf. Instead, Isaacson was responsible for maintaining and nurturing the business relationship between LexisNexis and customers that were originated by people other than him. As an account manager, Isaacson was responsible for upselling services within his named customer accounts. Consistent with Isaacson's servicing role, many of the customer accounts for which Isaacson was responsible during his employment with LexisNexis predated his employment altogether.

43. One of the software products that is marketed by LexisNexis to corporate legal departments is a product called CounselLink. CounselLink is an enterprise legal management and contract lifecycle management software solution that allows corporations of all sizes to track matters, contracts, legal hold notifications, legal vendors, and invoices all from one fully configurable platform.

44. LexisNexis sells CounselLink as a subscription-based software, meaning that LexisNexis charges a recurring fee to customers and in exchange grants them a license to use the software. Because CounselLink software is fully configurable, each of LexisNexis' customers can purchase "add-ons" and/or increased functionality and professional services to meet their particular needs.

45. LexisNexis invests time, energy and monetary resources to constantly evolve its product offerings to match and keep pace with state-of-the-art products and services offered to customers. In certain instances, LexisNexis partners with other service providers to provide new, cutting-edge technological products and professional services to its customers.

46.     When LexisNexis partners with another service provider, the services are often made a part of LexisNexis' agreement with its corporate customers and documented on LexisNexis paper. Notwithstanding that documentation, these partner services are then subcontracted to and performed by the partner service provider.

47.     LexisNexis account managers, like Isaacson, are compensated for selling these "partner services."

48.     LexisNexis routinely discusses its ongoing and new partnerships with its account managers, like Isaacson. Isaacson, and the rest of the LexisNexis account managers comprising the CounselLink Account Management Team, were consistently reminded of LexisNexis' roster of partner companies.

49.     LexisNexis offers managed bill review services to its corporate customers. Such customers may purchase managed bill review services on LexisNexis paper and pay LexisNexis for the agreed-upon managed bill review services rendered.

50.     LexisNexis, in turn, has engaged a partner company, Sterling Analytics ("Sterling"), to perform these managed bill review services for its customers.

51.     During his employment with LexisNexis, Isaacson was made fully aware of LexisNexis' working relationship with Sterling.

52.     Isaacson's knowledge of Sterling and LexisNexis' other partner companies was an important aspect of his work at LexisNexis and his ability to achieve his sales targets as an account manager. By understanding the breadth of the functionality of CounselLink, Isaacson could sell ancillary services in addition to system modules or functionality to corporate legal departments and position himself as a resource customers could turn to in order to maximize their investment in the software service. By understanding the breadth and functionality of the products offered by

LexisNexis through its partner companies, Isaacson was able to provide even greater value to LexisNexis customers in response to inquiries about their needs and preferences.

53.     Indeed, on at least two occasions since June 2023, Isaacson raised servicing-related questions that he received from LexisNexis customers concerning managed bill review services, and on each occasion, Isaacson was reminded that LexisNexis had partnered with Sterling and could, as a result, provide assistance in response to the customer's question about managed bill review services.

54.     To further allow Isaacson to manage, service and grow the CounselLink accounts to which he was assigned, LexisNexis granted Isaacson access to its Confidential Information and databases.

55.     One of the databases to which Isaacson was provided access was a Salesforce database where LexisNexis tracked and managed various sales opportunities with customers and prospective clients. The opportunities that Isaacson, other account managers, and account executives were responsible for inputting into this system included customer and prospective customer inquiries to subscribe to, add-on or configure their CounselLink subscription or expand their business relationship with LexisNexis through new and/or additional product or service offerings.

56.     Another database to which Isaacson was provided access was an internal facing instance of CounselLink, which LexisNexis uses as a CRM database to log and describe, among other data, customer interactions, contacts, preferences, and contract data.

57.     LexisNexis also directly introduced Isaacson to employees working for its customers, including the representatives of corporate legal departments with responsibility and authority to purchase LexisNexis' products and services. But for his employment at LexisNexis,

Isaacson would not have been introduced to these employees and would not have learned these purchasing preferences or needs of LexisNexis' customers.

58.     LexisNexis has invested considerable time, expense, and resources in its business and employees, including Isaacson during his employment, so that they can perform their work for LexisNexis competently and successfully.

59.     LexisNexis maintains trade secrets that are valuable, confidential, and proprietary to LexisNexis, and that are not generally known in the public domain.

60.     Through their work, LexisNexis' account managers, including Isaacson, gain detailed and intimate knowledge of LexisNexis' trade secrets and other confidential information.

61.     LexisNexis' trade secrets, confidential information, and business relationships have significant economic value to it. LexisNexis has a legitimate business interest in keeping such information confidential and not allowing its trade secrets and other confidential information to be disclosed to its competitors through any improper means.

62.     LexisNexis' trade secrets and confidential information would be of significant economic value to its competitors.

63.     Consequently, LexisNexis takes the protection of its information very seriously and expend a considerable amount of time and money to keep its information secure. At all relevant times, LexisNexis has taken extensive and reasonable steps to protect the confidentiality of its trade secrets and other confidential information. This includes:

    i.   Requiring all employees, including Isaacson, to sign confidentiality agreements;

    ii.   Storing confidential information on secured and password-protected computer systems, which require multi-factor authentication and are accessible only to LexisNexis' personnel;

    iii.   Ensuring that employee account creation and permission levels are restricted to only the resources needed to perform each employee's job

duties. When a user's role within the organization changes, those accounts and permission levels are changed/revoked to fit the new role and disabled when the user leaves the organization altogether;

    iv.   Requiring periodic data protection and device use training for all employees; and

    v.   Implementing employment policies and practices to govern its employee's conduct and acceptable use(s) of confidential information, including policies implementing a Code of Ethics and Business Conduct, a Summary of Code Violations, Trade Secret Guidelines and Electronic Workplace Policies.

64.    Isaacson was made aware of the above-referenced policies and security measures.

65.    LexisNexis issued Isaacson a company laptop to use exclusively for work purposes.

### III.    Prior to Resigning From LexisNexis, Isaacson Breaches His Duty of Loyalty and Misappropriates LexisNexis' Trade Secrets and Confidential Information

66.    Although Isaacson did not announce his resignation from LexisNexis until September 5, 2023, he began working for LBR by at least August 23, 2023.

67.    By August 23, 2023, Isaacson was assigned an LBR-related email address.

68.    As of August 23, 2023, Isaacson was also added to LBR business phone system and granted access to "Zoho One," a CRM database that Isaacson accessed using his LBR company email address.

69.    On August 23, 2023, Isaacson used his LexisNexis-issued laptop to access these LBR-related systems. Isaacson then repeatedly accessed LBR's Zoho One CRM database from his LexisNexis-issued laptop between August 23, 2023, and September 15, 20223, his final day with LexisNexis. Isaacson accessed LBR's CRM database from his LexisNexis laptop on at least September 3, September 5, September 14 and September 15.

70.    Almost immediately after receiving access to LBR's customer relationship management database, Isaacson also began accessing various LexisNexis customer lists that he

would have had no legitimate need to review as part of his current LexisNexis duties and responsibilities.

71.     For example, on August 26, 2023, Isaacson accessed different LexisNexis reports showing the account manager client assignments in each of 2019, 2020 and 2021.

72.     Because Isaacson's current work responsibilities for LexisNexis would not have required him to review these lists of account assignments, LexisNexis believes that Isaacson reviewed these customer lists for the purpose of misappropriating LexisNexis' confidential information for use on his own behalf and that of LBR.

73.     When Isaacson resigned his employment to LexisNexis, he did not inform LexisNexis where he was planning to go to work but stated that he was not going to work for a competitor to LexisNexis. Because of Isaacson's statements to LexisNexis, LexisNexis allowed him to continue to work for an additional ten days. Had Isaacson apprised LexisNexis that he planned to work for LBR, LexisNexis would not have allowed him to remain employed for those ten days.

74.     During Isaacson's final ten days with LexisNexis, he continued to access LexisNexis' confidential and proprietary information without a business-related justification for doing so. For example, on September 12 and 15, Isaacson not only accessed, but also exported to himself, a report titled "Execs., Corporate Champions and Influencer Contacts." This report contained the names and contact information of more than 850 contacts across approximately 295 LexisNexis customers, as well as information about the client's LexisNexis subscription fees for CounselLink, the strength of the business relationship they had with LexisNexis, and their assigned account manager.

75.     On his final day with LexisNexis, Isaacson also accessed a report titled "Opportunities Won This Year," which contained confidential and proprietary information regarding new customer accounts and new services sold to existing customers. Isaacson had no legitimate business reason to access this report on his final day with LexisNexis.

76.     Either before leaving LexisNexis' employ or shortly thereafter, Isaacson accessed LBR's CRM database and uploaded to that database information about LexisNexis' customers. The information that Isaacson uploaded to LBR's CRM database was taken by him without authorization.

77.     The information that Isaacson uploaded to LBR's CRM database is not easily ascertainable or publicly known. Indeed, although it would be possible for LBR or any entity trying to sell products and services to corporate legal departments and to identify large versus small corporations and/or large versus small legal departments, it would not have been possible for Isaacson or LBR to specifically identify all of the corporate legal departments utilizing LexisNexis products and services, nor to ascertain the approximate annual fees paid to LexisNexis for CounselLink, without accessing LexisNexis' customer lists. It also would not have been possible for Isaacson or LBR to specifically identify the representatives within such corporate legal departments that were authorized with purchasing and decision-making capabilities.

## IV.     After Resigning, Isaacson and LBR Embark on a Targeted Campaign to Directly Solicit Business Using Information Misappropriated From LexisNexis

78.     On September 28, 2023, Isaacson sent an email to certain LexisNexis employees with whom he formerly worked. In the email, Isaacson informed his former coworkers that he was "ramping up" certain "prospecting activities" on behalf of LBR "via a variety of online tools." Isaacson also suggested to his former coworkers that his use of these "online tools" would create

a "degree of likelihood" that he would be "reaching out" to their customers "sooner or later." A copy of Isaacson's September 28, 2023, email is attached as Exhibit 2.

79.     In his September 28, 2023, Isaacson requested permission from his former coworkers to use their names "if and when he [came] across a client." Isaacson stated that he wanted to leave the decision about whether he could use his coworkers' names as part of his "prospecting activities" up to them individually.

80.     Isaacson's September 28, 2023, email went into the junk email folders of all of its recipients at LexisNexis. No recipient responded to Isaacson's email, and no recipient authorized Isaacson to use their name as part of any "prospecting activities" that Isaacson performed on his own behalf or that of LBR.

81.     Despite receiving zero responses to his September 28, 2023, email and without authority from any representative of LexisNexis, Isaacson and LBR moved forward with a targeted series of solicitations to LexisNexis' customers only several days later.

82.     The targeted solicitations that LBR and Isaacson made were intentionally and deliberately created using LexisNexis' confidential information and trade secrets. These targeted solicitations were not randomly generated as part of a "cold calling" marketing campaign.

83.     LexisNexis is aware of at least eleven customer solicitations that were sent by Defendants to LexisNexis customers on October 5 and 6, 2023.

84.     In each of Defendants' solicitations, Isaacson used the names of his former LexisNexis coworkers without their permission. Later in the solicitation, Isaacson (again without authority) asserted that LBR sells services that "play beautifully" with LexisNexis' CounselLink. Finally, Isaacson stated that LBR's President, Ryan Loro, had "happily agreed" to introduce himself and answer any questions that the customer target might have about LBR.

85. The solicitations sent by Isaacson to LexisNexis customers followed the format/template below, in addition to mentioning the customer's current LexisNexis account manager by name in the subject line of the email:

Hi [Customer Name],

Good morning, and I hope your week is going well! By way of introduction, my name is Aaron Isaacson, and I am a Business Development Executive with LegalBillReview.com (LBR). I am also a personal friend and former 5-year colleague of [Insert LexisNexis Account Manager], your CounselLink Account Manager. I wanted to take a brief moment of your time to share a little bit about what we do.

In short:

- LegalBillReview.com helps in-house legal teams save time, reduce legal expenses, and improve outside counsel relationships.

- LBR eliminates the burden of reviewing invoices, enhances existing e-billing software, and most importantly, reduces outside counsel spend.

- LBR's US-based, licensed, and experiences [sic] attorneys/legal analysts review every invoice to ensure each charge is reasonable and in compliance with your billing guidelines. They then work in collaboration, including negotiating, with your outside legal teams to adjust any billing errors and/or overcharges.

I am beyond excited to show you want this service has to offer, and rest assured, I am just as passionate about this as I was with LexisNexis CounselLink. In fact, LBR and CounselLink can play beautifully together, one of the main reasons I chose to come here.

If agreeable, I would love to the opportunity to schedule 30 minutes of your time in order to chat further and briefly talk about what we have to offer. I'm also excited to say that LBR's President, Ryan Loro, has happily agreed to join our call, introduce himself, express his support and answer any questions you may have.

Please let me know if any of the following days and times work for you and
I'll be happy to issue an invitation accordingly:

[Insert proposed meeting times.]

Thanks in advance for the consideration, and I'll eagerly await your reply.

86.     Defendants' use of the names of Isaacson's former LexisNexis coworkers and
assertions about LexisNexis' CounselLink software were intentional and done for the purpose of
attempting to create and/or generate credibility with the customer target.

87.     Defendants' customer solicitations intentionally exploited the goodwill that
LexisNexis had created for itself with its own customers for Defendants' own benefit—without
permission from LexisNexis to do so.

88.     The goal of Defendants' exploitation of LexisNexis' goodwill and reputation for
their own purposes is self-evident. Through their misappropriation and misuse of LexisNexis'
customer lists and attempts to create a false association between LBR and LexisNexis, Defendants'
goal was to elevate marketing communications that would only have been a "cold call" under
normal circumstances to a targeted solicitation sent to high-ranking corporate decisionmakers from
a potential vendor appearing to have the "backing" of LexisNexis.

89.     All of Defendants' customer solicitations about which LexisNexis is currently
aware were sent to individuals whose contact information appeared on the customer lists Isaacson
admits to have exported and uploaded to LBR's CRM database.

90.     Defendants' solicitations of LexisNexis' customers were unauthorized, deceptive,
and had the effect of confusing the targeted customers. Indeed, in at least one instance, the recipient
of Defendants' solicitation stated to his LexisNexis account representative that "it does seem this
company is associated or partner [sic] with LexisNexis." That conclusion drawn by the targeted
customer was false and inaccurate.

V.   **Defendants' Obfuscation and Deception When Confronted Regarding Their Misconduct**

91.   On October 6, 2023, LexisNexis sent a cease-and-desist letter to Isaacson, informing him that his actions violated his post-employment obligations to LexisNexis and demanding that he cease-and-desist from further unlawful conduct. A copy of LexisNexis' October 6, 2023, Letter is attached as Exhibit 3.

92.   On October 6, 2023, LexisNexis forwarded its cease-and-desist letter to LBR as well. A copy of LexisNexis' October 6, 2023, email to LBR is attached as Exhibit 4.

93.   On October 13, 2023, an attorney representing Isaacson responded to LexisNexis. A copy of the October 13, 2023, letter is attached as Exhibit 5.

94.   In a section of the letter titled "Confidential Information," Isaacson admitted having LexisNexis' "CRM Information" in his possession. However, Isaacson did not acknowledge that he had begun working for LBR weeks prior to resigning from LexisNexis and did not account for his unauthorized activities taken in violation of his duty of loyalty to LexisNexis.

95.   On October 17, 2023, LexisNexis advised Isaacson's attorney that her clients had not apprised her of the full scale and severity of their misconduct. A copy of LexisNexis' October 17, 2023, Letter is attached as Exhibit 6. In its letter, LexisNexis advised that a forensic review of Isaacson's computer activities at the end of his employment with LexisNexis was underway.

96.   Even after being told that LexisNexis was investigating Isaacson's computer activities at the end of his employment, neither Isaacson nor LBR made any attempt to communicate with LexisNexis about what that investigation would uncover. Instead, Isaacson and LBR continued their attempts to sidestep the consequences of their unlawful actions.

97.   For example, even though their attorney told LexisNexis that Isaacson had been "sidelined" on account of LexisNexis' October 6 letter, Isaacson traveled with other high-ranking

executives from LBR to an industry conference held in Texas during the week of October 23, 2023. The conference was attended by many of LexisNexis' customers.

98.     Moreover, even though Isaacson and LBR admitted that Isaacson and they were both in wrongful possession of LexisNexis' "CRM information," LBR asserted that it had created a business relationship with certain of LexisNexis' customers prior to hiring Isaacson.

99.     LBR has failed and/or refused to provide LexisNexis with any information to identify any such preexisting business relationship(s)—despite LexisNexis' requests to do so.

## CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF THE FEDERAL DEFEND
### TRADE SECRETS ACT, 18 U.S.C. §§ 1836, et seq.
### (Against Isaacson and LBR)

100.    LexisNexis repeats and re-alleges each and every allegation stated in the preceding paragraphs of the Complaint as if fully set forth herein.

101.    The customers lists and other confidential and proprietary information that Isaacson reviewed and/or exported to himself between at least August 23, 2023, and September 15, 2023—examples of which are highlighted above—constitute trade secrets within the meaning of the DTSA because:

    i.   Such information is not known outside LexisNexis's businesses and is known within LexisNexis's businesses only on a need-to-know basis.

    ii.   LexisNexis takes reasonable measures to protect the secrecy of this information. This information is highly valuable and derives its value from being secret. LexisNexis expends considerable effort to generate this information.

    iii.   This information is very difficult – if not impossible – for others to properly acquire or duplicate without LexisNexis's authorization and is not readily ascertainable.

    iv.   This information would be highly valuable to LexisNexis's competitors, such as LBR.

102.     Isaacson used improper means to misappropriate LexisNexis' trade secrets in his final days of employment – in violation of company policy – without any legitimate business reason for doing so.

103.     LBR improperly acquired LexisNexis' trade secrets with knowledge that Isaacson had only gained access to such information while under a contractual and legal duty to maintain its confidentiality on LexisNexis' behalf.

104.     Defendants misappropriated LexisNexis' trade secrets so that they could use them for their own benefit and that of LBR.

105.     After misappropriating LexisNexis' trade secrets, Defendants used LexisNexis' trade secrets to generate targeted solicitations for business that were sent to LexisNexis' customers. Through their actions, Defendants intended to convert LexisNexis' trade secrets to their own economic benefit.

106.     LexisNexis has suffered irreparable harm as a result of such conduct, will continue to suffer irreparable harm in the absence of an injunction, and has no adequate remedy at law without an injunction.

107.     As a direct and proximate result of Defendants' conduct, LexisNexis is entitled to actual damages in an amount to be determined at trial. Defendants' acts and conduct were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

**COUNT TWO**
**VIOLATION OF THE ILLINOIS TRADE SECRETS ACT, 735 ILCS 1065, et seq.**
**(Against Isaacson and LBR)**

108.    LexisNexis incorporates the preceding allegations as if fully set forth herein.

109.    By the conduct alleged herein and described above, Defendants improperly acquired and misappropriated, or threaten to acquire and misappropriate, or inevitably will acquire and misappropriate, LexisNexis's trade secret information.

110.    LexisNexis' trade secret information is sufficiently secret to derive economic value from not being generally known to others who can obtain economic value from its disclosure or use.

111.    As set forth above, LexisNexis has taken reasonable efforts and measures to keep and maintain the secrecy and confidentiality of these trade secrets. Isaacson obtained LexisNexis' trade secrets under circumstances giving rise to a duty owed by him to LexisNexis to maintain their secrecy and limit their use.

112.    As set forth above, by the conduct alleged herein, Defendants misappropriated the trade secrets by, among other things, using and disclosing, without LexisNexis' consent, and/or acquiring the trade secrets while knowing or having reason to know that they were doing so by improper means.

113.    LBR breached and/or induced the breach of Isaacson's duty to maintain the secrecy of said trade secrets. LBR derived LexisNexis' trade secret information from or through Isaacson knowing same to have been misappropriated without LexisNexis' authorization.

114.    Defendants intended to convert the trade secrets to their economic benefit, without LexisNexis' consent, for anti-competitive use and to convert LexisNexis customers to LBR.

115. As a direct and proximate result of the foregoing, LexisNexis has suffered and will continue to suffer immediate irreparable harm, injury and loss. Pursuant to the ITSA, actual misappropriation may be enjoined. Unless enjoined by this Court, Defendants will continue to use LexisNexis' trade secret information to unfairly compete and enjoy commercial advantage that they would not otherwise have.

116. As a direct and proximate result of Defendants' conduct, LexisNexis is entitled to damages in an amount to be determined at trial. Defendants' conduct was willful and malicious, justifying an award of exemplary damages and attorneys' fees.

## COUNT THREE
## BREACH OF CONTRACT
### (Against Isaacson)

117. LexisNexis incorporates the preceding allegations as if fully set forth herein.

118. LexisNexis and Isaacson entered into a valid and enforceable contract, attached as Exhibit 1.

119. LexisNexis has performed all duties and obligations under the Agreement. And, in return for Isaacson's promises set forth in the Agreement, Isaacson received substantial consideration, including approximately four years of continuous employment with LexisNexis, and access to LexisNexis' trade secrets and confidential information, which included access to LexisNexis' customer lists and CRM databases.

120. Isaacson is in direct violation of the Non-Disclosure provision in the Agreement. Isaacson has admitted that he has disclosed, revealed, published, and/or made available to LBR information that is LexisNexis' Confidential Information as defined in the Agreement.

121. Isaacson is in direct violation of "Return of Company Property and Information" provision in the Agreement. Despite LexisNexis' request, Isaacson has refused to provide

LexisNexis with access to his personal electronic devices to ensure that the LexisNexis Confidential Information he admittedly possesses is removed from his possession.

122.    Isaacson is in direct violation of the Non-Competition provision in the Agreement. During his employment with LexisNexis, Isaacson accepted employment with LBR in violation of the Non-Competition provision and he has continued that employment since resigning from LexisNexis. LBR directly competes with LexisNexis in Restricted Businesses.

123.    Isaacson has directly violated the Non-Solicitation provision in the Agreement by soliciting LexisNexis' customers with whom he had Material Contact and about whom he obtained Confidential Information during his LexisNexis employment. Isaacson has solicited these LexisNexis customers using trade secret and Confidential Information he misappropriated from LexisNexis and has done so with the intent to interfere with LexisNexis' business relationships with its customers.

124.    Isaacson is now or has recently engaged in efforts to build support for a directly competitive business to LexisNexis. His efforts include soliciting customers that currently or having recently transacted business with LexisNexis in an effort to convince them to divert their work, resources, cases, or services to his new employer, LBR.

125.    Isaacson's conduct, by and through his work at LBR and the efforts he has and will continue to make to divert work, resources, cases or services from LexisNexis to LBR constitute a clear violation of the terms of Isaacson's Agreement with LexisNexis.

126.    As a direct and proximate result of the above conduct, LexisNexis has suffered and continues to suffer damages, including but not limited to, lost business, lost profits, costs of retaining clients, and damage to goodwill, in an amount to be determined at trial.

127. LexisNexis has also suffered and will continue to suffer immediate, irreparable harm warranting temporary, preliminary and permanent relief. Injunctive relief is necessary as LexisNexis is without an adequate remedy at law to prevent this harm to LexisNexis.

128. Pursuant to the above-referenced Agreement and as warranted by governing law, LexisNexis is entitled to injunctive relief, as well as its costs and expenses, including attorneys' fees, incurred in bringing this action. Indeed, without immediate relief in the form of an order enjoining Isaacson, as set forth above, LexisNexis will continue suffering losses, experiencing harm to its name, reputation, and other goodwill – something traditional legal remedies cannot adequately address.

**COUNT FOUR**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against LBR)**

129. LexisNexis incorporates the preceding allegations as if fully set forth herein.

130. LexisNexis and Isaacson entered into the Agreement, which is a valid and enforceable contract.

131. LBR, with knowledge of the Agreement, its provisions, and the post-employment obligations that Isaacson owes to LexisNexis, has tortiously interfered with the Agreement.

132. LBR's tortious conduct includes: (i) recruiting and employing Isaacson in a position that is directly competitive to Isaacson's role with LexisNexis; (ii) deploying and encouraging Isaacson to interact with customers of LexisNexis and with whom Isaacson interacted with while employed with LexisNexis and/or about whom Isaacson obtained confidential information during his employment with LexisNexis, all for the purpose of diverting business away from LexisNexis and to LBR.

133.     LBR's tortious interference is ongoing, intentional, and malicious. Despite LexisNexis' demands to cease-and-desist from its improper activity concerning Isaacson, LBR has failed and/or refused to demand that Isaacson adhere to his post-employment obligations to LexisNexis and LBR has failed and/or refused to place Isaacson in a role that is not directly competitive with his former position at LexisNexis.

134.     As a direct and proximate result of the above conduct, LexisNexis has suffered and continues to suffer damages, including but not limited to, lost business, lost profits, costs of retaining clients, and damage to goodwill, in an amount to be determined at trial.

135.     LexisNexis has also suffered and will continue to suffer immediate, irreparable harm warranting temporary, preliminary and permanent relief. Injunctive relief is necessary as LexisNexis is without an adequate remedy at law to prevent this harm to LexisNexis.

136.     LexisNexis is entitled to injunctive relief, as well as its costs and expenses, including attorneys' fees, incurred in bringing this action, to the fullest extent provided by law. Indeed, without immediate relief in the form of an order enjoining LBR, as set forth above, LexisNexis will continue suffering losses, experiencing harm to its name, reputation, and other goodwill – something traditional legal remedies cannot adequately address.

**COUNT FIVE**
**BREACH OF FIDUCIARY DUTY**
**(Against Isaacson)**

137.     LexisNexis incorporates the preceding allegations as if fully set forth herein.

138.     As an employee of LexisNexis, Isaacson owed fiduciary duties to LexisNexis, including the duties of loyalty and good faith.

139.     Isaacson breached his fiduciary duties of loyalty to LexisNexis by knowingly and intentionally acting adverse to LexisNexis' interests during his employment with LexisNexis by:

(a) using LexisNexis information for the benefit of LBR; (b) planning a resignation designed to harm LexisNexis; and/or (c) supplying LBR with confidential, proprietary and/or trade secret information for the purpose of allowing LBR to divert business opportunities away from LexisNexis.

140.     Because of Isaacson's actions, LexisNexis has suffered, and will continue to suffer, damages and loss.

141.     Isaacson's actions were intentional, willful, outrageous, and malicious.

142.     LexisNexis has also suffered, and will continue to suffer, immediate and irreparable harm as a result of such breaches, and if Defendants are not enjoined, LexisNexis will continue to suffer such injury. Injunctive relief is necessary as LexisNexis is without an adequate remedy at law to prevent this harm to LexisNexis.

## COUNT SIX
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
#### (Against LBR)

143.     LexisNexis incorporates the preceding allegations as if fully set forth herein.

144.     Isaacson and LBR knew that their conduct breached Isaacson's duty of loyalty to LexisNexis.

145.     LBR gave Isaacson substantial assistance, incentives, and/or encouragement to breach his fiduciary duties.

146.     Because of Isaacson and LBR's conduct, LexisNexis has suffered damages and loss, in an amount to be determined at trial.

147.     LexisNexis has also suffered, and will continue to suffer, immediate and irreparable harm as a result of such aiding and abetting of breaches of fiduciary duty, and if Defendants are

not enjoined, LexisNexis will continue to suffer such injury. Injunctive relief is necessary as LexisNexis is without an adequate remedy at law to prevent this harm to LexisNexis.

**COUNT SEVEN**
**FALSE ASSOCIATION UNDER**
**LANHAM ACT, 15 U.S.C. §§ 1125(a)(1)(A)**
**(Against Isaacson and LBR)**

148.    LexisNexis incorporates the preceding allegations as if fully set forth herein.

149.    In their targeted customer solicitations, Defendants used name(s) and term(s) associated with LexisNexis, including LexisNexis' CounselLink software product.

150.    Defendants' use of name(s) and term(s) associated with LexisNexis occurred through interstate commerce and was intentionally done to mislead the consumers targeted into believing that the products and services being offered for sale by LBR were associated with products and services offered for sale by LexisNexis.

151.    As a result of Defendants' actions to falsely associate LBR's products and services with those of LexisNexis, Defendants have confused consumers as to the products that actually are affiliated with LexisNexis.

152.    LexisNexis has suffered damages as a result of Defendants' intentional and misleading conduct, and LexisNexis will continue to suffer irreparable harm unless Defendants are enjoined from continuing to falsely associate LBR's products and services with LexisNexis.'

153.    This conduct and activity by Defendants constitutes false association in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

**PRAYER FOR RELIEF**

LexisNexis respectfully requests judgment in its favor on the above causes of action and seeks an order from the Court awarding it the following relief:

A.      A temporary restraining order and preliminary injunction, enjoining and restraining: (i) Isaacson, and anyone acting in concert with him, including LBR, from violating, or participating in the violation of, any of the terms of the Agreement; (ii) LBR, and anyone acting in concert with it, from interfering with the Agreement; (iii) Defendants, and anyone acting in concert with them, from contacting, soliciting, or servicing any customer, prospective customer, or referral source about whom Isaacson possessed or learned confidential information about while employed at LexisNexis, including but not limited to any person listed on any document misappropriated by Isaacson from LexisNexis; (iv) Defendants, and anyone acting in concert with Defendants, from utilizing, divulging, disclosing, or misusing any LexisNexis Confidential Information (as defined by the Agreements) and trade secrets;

B.      An Order requiring Defendants to preserve all documents, electronically stored information, and other information relevant to the factual allegations and claims contained within this Complaint, including any communications, text messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by and between Isaacson and LBR and between Defendants and any LexisNexis customer, prospective customer, or referral source;

C.      An Order requiring Defendants to return all copies of any document and/or information that was downloaded or otherwise obtained from LexisNexis' systems or databases that Isaacson and/or LBR still have in their possession after Isaacson left his employment with LexisNexis;

D.      An Order requiring Defendant to stipulate to and agree with counsel for LexisNexis on a non-party forensic vendor to perform a forensic review of LBR's computer systems, any LBR electronic device issued to Isaacson, and any personal electronic device used by or belonging to

Isaacson to accomplish the return and remediation (i.e., permanent removal from Defendants' possession) of any document and/or information that was downloaded or otherwise obtained from LexisNexis' systems or databases that Isaacson and/or LBR still have in their possession after Isaacson left his employment with LexisNexis;

E.      An Order granting preliminary and permanent injunctive relief in accord with Paragraph A above, and as separately may be requested at a preliminary injunction hearing and any trial;

F.      An Order awarding LexisNexis its actual and exemplary damages (including, for willful and malicious misappropriation, double actual and unjust enrichment damages under 765 ILCS § 1065/4 and 18 U.S.C § 1836(b)(3)(C)), in an amount to be determined at trial;

G.      An Order awarding LexisNexis its pre- and post-judgment interest as allowed by law, as well as its attorneys' fees and costs for this action (including attorneys' fees and costs under 765 ILCS § 1065/5 and 18 U.S.C § 1836(b)(3)(C) for willful and malicious misappropriation); and

H.      An Order awarding any and all other available damages, including punitive damages and such other and further relief as the Court deems just and proper.

## **<u>JURY DEMAND</u>**

RELX Inc. d/b/a LexisNexis hereby demands a trial by jury to the fullest extent of the law and on all counts triable to a jury.

Dated: October 30, 2023                                   Respectfully submitted,

                                                                          **RELX, INC. d/b/a LEXISNEXIS**

                                                                          By: *<u>/s/ James M. Witz</u>*
                                                                                  One of its attorneys

                                                                          James M. Witz
                                                                          Richard T. Kienzler

LITTLER MENDELSON, P.C.
321 North Clark, Suite 1100
Chicago, Illinois 60654
Phone: (312) 372-5520
Email: jwitz@littler.com
rkienzler@littler.com

-and-

Miguel A. Lopez (*motion for pro hac vice admission forthcoming*)
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Floor
New York, New York 10022
Phone: (212) 583-9600
Email: malopez@littler.com

## <u>VERIFICATION</u>

I, Micah Johnson, am the authorized representative of RELX Inc. d/b/a/ LexisNexis ("LexisNexis") for purposes of verifying the foregoing Complaint. I have personal knowledge of the matters set forth in the Complaint or the information contained therein has been collected and made available to me by counsel and employees of LexisNexis. I affirm that the factual information and statements made therein are true and correct to the best of my knowledge and belief.

> I declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

> By: _____
>              Micah Johnson

> Dated: October 30, 2023

### CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the date shown below he caused a copy of the foregoing **Complaint for Injunctive and Other Relief** to be filed electronically with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the Court's CM/ECF system.

In addition to making the filing, the undersigned attorney certifies that on the date shown below, he caused a copy of the foregoing document to be sent to Aaron Isaacson by email and Federal Express delivery at the following addresses:

> Rachel E. Bossard
> Burke, Warren, MacKay & Serritella
> 330 North Wabash Avenue, Suite 2100
> Chicago, Illinois 60611-3607
> rbossard@burkelaw.com

Dated: October 30, 2023                    By: */s/ Richard T. Kienzler*
                                                       Attorney for RELX, Inc. d/b/a
                                                       LexisNexis